UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


ARCH SPECIALTY INSURANCE COMPANY,

       Plaintiff

v.                                      Civil Action No. 2:08-0285

GO-MART, INC.; JOE MEADOWS;
J.T. DAVENPORT & SONS, INC.;
and ROBERT D. RADER,

       Defendants

and

GO-MART, INC.,

       Third Party Plaintiff,

v.

GAB ROBINS NORTH AMERICA, INC.;
and SOUTHERN GUARANTY INSURANCE
COMPANY,

       Third Party Defendants

and

J.T. DAVENPORT & SONS, INC.;
and ROBERT D. RADER,

       Third Party Plaintiffs,

v.

SOUTHERN GUARANTY INSURANCE
COMPANY,

       Third Party Defendant

1

## MEMORANDUM OPINION AND ORDER

Pending are defendant and third party plaintiff Go-Mart, Inc.'s, ("Go-Mart") Motion for Summary Judgment as to its third party claims against third party defendant Southern Guaranty Insurance Company ("Southern Guaranty"), joined by plaintiff Arch Specialty Insurance Company ("Arch"); Go-Mart's Motion for Summary Judgment as to its cross claims against defendant J.T. Davenport & Sons, Inc., ("Davenport"), joined by third party defendant GAB Robins North America, Inc., ("GAB"); Go-Mart's Motion for Summary Judgment as to its third party claims against GAB, joined by Arch; Arch's Motion for Summary Judgment as to its claims against Go-Mart; Davenport and Robert D. Rader's Motion for Summary Judgment as to their "cross claims" against Southern Guaranty joined by Go-Mart, Arch and GAB; and Southern Guaranty's Motion for Summary Judgment against Go-Mart and Davenport.

The issues in this bifurcated action dealt with herein arise in Phase I. Phase II will deal with claims of bad faith and unfair trade practices relating to insurance policies issued by Southern Guaranty.

## I. Background and Prior Lawsuit

This case arises from an underlying action in the Circuit Court of Kanawha County brought in 2006 by Joe Meadows against Rader, Go-Mart and Davenport.  <u>See</u> Civil Action No. 06-C-210.  The relevant facts of that action are set forth below.

On June 13, 2005, Joe Meadows was injured at a Go-Mart located in Marmet when a Davenport delivery truck driven by Rader was completing a delivery made at the customer service window, per Go-Mart's instructions.  (Southern Guaranty Mem. Supp. Mot. Summ. J. 4).  Upon exiting the Go-Mart premises, the truck backed over Meadows, resulting in an amputation of one of his legs above the knee, along with other injuries.  (Arch Compl. ¶¶ 9-10; Southern Guaranty Mot. Summ. J. 4).

On July 22, 2005, Go-Mart sent a letter to GAB, its third party claims administrator, informing it that Meadows was represented by counsel and pursuing a claim regarding the accident.  (Go-Mart Mem. Supp. Mot. Summ. J. GAB 4).  GAB then secured representation for Go-Mart and tendered the defense and indemnity of Go-Mart to Davenport and Southern Guaranty, Davenport's insurer.  (GAB Resp. Arch Mot. Summ. J. 2-3).

3

On February 7, 2006, Meadows instituted the underlying action against Rader, Go-Mart and Davenport. (Arch Compl. ¶ 12). The complaint alleged negligence on behalf of Rader and Davenport, and that Go-Mart was negligent in permitting Rader to park and make deliveries near its front door and customer service window. (GAB Resp. Arch Mot. Summ. J. 3). On July 31, 2006, Southern Guaranty agreed to defend Go-Mart in the underlying action, but with the following reservation of rights, "[Southern Guaranty] shall provide a defense to Go-Mart for any and all liability of Go-Mart arising out of or in any way connected to the operation of the truck on Go-Mart's premises." (Arch Compl. ¶ 13; GAB Resp. Arch Mot. Summ. J. 3). In this letter, Southern Guaranty also stated, "If Go-Mart has any other insurance coverage that may apply to this lawsuit, such insurance carrier should be notified immediately to protect the rights under that policy." (Davenport Cross-clm. against Southern Guaranty Ex. E 2). Go-Mart was then insured by Arch who was not notified of the accident or the lawsuit by either Go-Mart or GAB until after judgment in the underlying action. (Arch Br. Supp. Mot. Summ. J. 4).

Following an October 2007 jury trial, the jury found the percentage of fault as follows: Joe Meadows 33.32% at fault,

4

Rader/Davenport 33.34% at fault, and Go-Mart 33.34% at fault.
(Arch Compl. Ex. E 2).  The jury awarded Meadows $3,000,000.
(Arch Compl. Ex. E 2).  This award was reduced by his own
percentage of fault by 33.32%, and judgment was entered for
Meadows in the amount of $2,052,848.18 against Davenport, Rader
and Go-Mart.  (Arch Compl. Ex. E 2).  Specifically, the jury
checked "YES" on a Jury Verdict Form that asked, "Do you, the
jury, find that defendant Go-Mart, Inc., was guilty of negligence
which proximately caused the subject accident?"  (Jury Verdict
Form 1).  On January 23, 2008, Go-Mart's post-trial motions were
denied.  On February 25, 2008, Southern Guaranty withdrew its
defense and indemnification of Go-Mart.  (Go-Mart Mot. Summ. J. ¶
7).  In doing so, Southern Guaranty assumed that the jury found
Go-Mart independently negligent, rather than vicariously liable,
and therefore there was no coverage under the Davenport policy.
(Davenport Cross-clm. against Southern Guaranty Ex. G 1-2).  On
March 6, 2008, GAB notified Arch, Go-Mart's insurer, of the
underlying action and the judgment entered therein.  (Arch Compl.
¶ 22).

        On April 30, 2008, Arch instituted this action against
Go-Mart, Meadows, Davenport and Rader, seeking a declaration that
it was not obligated to cover Go-Mart's damages relating to the

5

underlying action because of untimely notice of claim.  (Arch
Compl. 9).  Go-Mart filed a cross claim against Davenport on July
21, 2009, seeking indemnification.  (Go-Mart Cross Claim 9).  On
August 13, 2009, Go-Mart filed a third party complaint against
GAB for breach of contract and duty to indemnify, and against
Southern Guaranty seeking a declaratory judgment that Southern
Guaranty was obligated to defend and indemnify Go-Mart.  (Go-Mart
3d Party Compl. 5-6, 8-9).  Go-Mart amended its third party
complaint on January 8, 2009, alleging a violation of the Unfair
Trade Practices Act and bad faith, (Go-Mart Amd. 3d Party Compl.
5-6).  On October 9, 2008, Davenport and Rader, jointly
represented, filed a "cross claim" against Southern Guaranty
seeking a declaratory judgment that Southern Guaranty's insurance
policies cover Davenport's indemnification of Go-Mart, and
alleging a violation of the Unfair Trade Practices Act and bad
faith.  (Davenport Cross Claim 12).[1]

## II. Summary Judgment Standard

A party is entitled to summary judgment "if the

---

[1] By agreed order between Davenport and Southern Guaranty,
these claims are treated as a third party complaint, and Southern
Guaranty's answer thereto as its answer to Davenport's third
party complaint.

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Our court of appeals, in Bank of Montreal v. Signet Bank, 193 F.3d 818 (4th Cir. 1999), recognized that contract

7

interpretation is a matter "particularly suited for summary judgment disposal." Id. at 835.  However, only when the terms of the contract are unambiguous may the court properly interpret the contract as a matter of law.  Washington Metropolitan Area Transit Authority v. Potomac Investment Properties, Inc., 476 F.3d 231, 235 (4th Cir. 2007); Sempion v. Provident Bank, 75 F.3d 951, 959 (4th Cir. 1999).

III. Analysis

A. The Service Agreement Between Go-Mart and Davenport Indemnifies Go-Mart for Its Own Negligence

On May 19, 2004, Go-Mart and Davenport entered into a three-year Service Agreement wherein Davenport agreed to sell and deliver products to Go-Mart stores.  (Go-Mart Mot. Summ. J. Davenport ¶ 1).  The Service Agreement sets forth that Davenport will be Go-Mart's exclusive supplier.  (Service Agreement ¶ 7). The indemnification provision of the Service Agreement states,

> JTD [Davenport] agrees to defend, indemnify and hold harmless the Customer [Go-Mart] against any and all claims, demands, actions, lawsuits or any other liability including reasonable attorney's fees arising out of or incurred by the Customer in connection with the operation of any JTD equipment on Customer's premises.

(Service Agreement ¶ 11).  The Service Agreement further states

8

that the agreement "shall be construed and performed in
accordance with the law of the State of North Carolina at the
date of this Agreement."  (Service Agreement 2).

Go-Mart and Davenport agree that Davenport must
indemnify Go-Mart for the <u>Meadows</u> verdict because the claim was
connected with the operation of Davenport's equipment on Go-
Mart's premises.  (Go-Mart Mot. Summ. J. Davenport;  Davenport
Resp. to Go-Mart Mot. Summ. J. Davenport).

Southern Guaranty, the defendant in a "cross claim"
brought by Davenport, and a third party defendant in the third
party complaint brought by Go-Mart, claims that this Service
Agreement between Go-Mart and Davenport does not indemnify Go-
Mart for Go-Mart's independent negligence, but rather only
Davenport's negligence.  (Southern Guaranty Mem. Supp. Mot. Summ.
J. 13).  Southern Guaranty contends further, albeit in the
absence of a special interrogatory, that the jury in the
underlying <u>Meadows</u> action found Go-Mart negligent for its role in
directing Davenport's driver to park his truck in a dangerous
area, and therefore the Service Agreement does not indemnify Go-
Mart in this case.  (Southern Guaranty Mem. Supp. Mot. Summ. J.
13).

9

For a contract clause that includes indemnity against negligence to be upheld, North Carolina law holds that such provisions must be made "unequivocally clear in the contract." Schenkel & Schultz, Inc. v. Hermon F. Fox & Associates, P.C., 180 N.C.App. 257, 266 n. 4, 636 S.E.2d 835, 842 n. 4 (N.C. Ct. App. 2006). The North Carolina Court of Appeals has held the phrase "from whatsoever cause arising" in an indemnity provision similar to the one at issue to be unequivocally clear in favor of covering a party's negligence. Cooper v. H.B. Owsley & Son, Inc., 43 N.C.App. 261, 267-68, 258 S.E.2d 842, 846 (N.C. Ct. App. 1979).

Further, in West Virginia "[c]ontracts of indemnity against one's own negligence do not contravene public policy and are valid." Riggle v. Allied Chem. Corp., 180 W.Va. 561, 567, 378 S.E.2d 282, 288 (1989) (quoting Sellers v. Owens-Illinois Glass Co., 156 W.Va. 87, 191 S.E.2d 166, syl. pt. 1 (1972)).

The indemnity provision in the Service Agreement requires Davenport to indemnify Go-Mart for all claims arising out of or incurred by Go-Mart in connection with the operation of Davenport's trucks on Go-Mart's premises, as occurred here. The contract does not provide an exclusion for Go-Mart's own negligence. The phrase "all claims arising out of or incurred in

10

connection with" is not so distinguishable here from the phrase
"from whatsoever cause arising" as to warrant differing
determinations.  Both encompass all claims for damage against the
indemnitee that fell within the framework of the language adopted
by the contracting parties.  It is quite clear that the Meadows
claim against Go-Mart arose out of <u>and</u> was in connection with the
operation of the Davenport vehicle on Go-Mart's premises.[2]
Inasmuch as the indemnification provision is "unequivocally
clear," the provision must be enforced as written.


**B. The Insurance Agreements Between Southern Guaranty and
Davenport Require Southern Guaranty to Cover Davenport's
Indemnification of Go-Mart**


        Davenport purchased three insurance policies from
Southern Guaranty, each of which had policy periods of June 1,
2005 to June 1, 2006.  (Davenport Mot. Summ. J. Southern Guaranty
¶ 2).  The policies are the $1 million Business Auto Policy
("BAP"), the $1 million Commercial General Liability Coverage
("CGL") and the $10 million Umbrella Policy.

---

        [2]  Moreover, Go-Mart and Davenport have agreed and admitted
during the course of this action that the original intent of both
parties was to include in the phrase "all claims" those claims
resulting from Go-Mart's negligence.  While this may be a self-
serving admission by Go-Mart, that is not necessarily the case
for Davenport.

Southern Guaranty asserts that the BAP is the only policy applicable to this case, and that the policy's limit of $1,000,000 was exhausted when Southern Guaranty paid Davenport's portion of the Meadows judgment in the amount of $1,134,127.52.[3] (Southern Guaranty Mem. Supp. Mot. Summ. J. 14, 22).

Southern Guaranty's argument that the CGL does not apply here is two-fold.  First, Southern Guaranty observes that the CGL excludes coverage for injury or damage arising out of the use of an automobile owned or rented by the insured.  (Southern Guaranty Mem. Supp. Mot. Summ. J. 21, CGL 3).

Second, the BAP contains a limitation that specifies that the BAP shall not be combined with another Southern Guaranty Policy.  (BAP 8).  This limitation states,

> If this Coverage Form and any other Coverage Form or Policy issued to you by us or any company affiliated with us apply to the same "accident", the aggregate maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy.  This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Form.

--------

[3] It is unclear pursuant to which policy or policy provision the extra $134,127.52 was paid, but it may be an amount that includes items falling under the "Supplementary Payments" provision of the BAP, such as interest.  See supra at 13-14.

(BAP 8).  Inasmuch as the coverage as between the BAP and the CGL policies is in any event effectively limited by this provision to $1 million for the same accident, it suffices that the $1 million has been made available from the BAP policy.

The purpose of an umbrella policy is to apply as excess insurance over the other insurance policies so as to extend the coverage limits.  The limitation just quoted, by its very terms, does not apply to excess insurance.  Thus, Southern Guaranty's position that Davenport is not covered by the Umbrella Policy as an extension of the coverage of the BAP is at issue.

### 1. Business Auto Policy

The BAP sets forth that Southern Guaranty will pay "all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'"  The BAP goes on to define "an insured" as including Davenport and covered Davenport employees and partners using Davenport vehicles for a permitted purpose.  (BAP 2).  The section of the BAP entitled "Coverage Extensions" states in its subsection (A) that Southern Guaranty

13

will pay supplementary payments such as expenses Southern

Guaranty incurs, the cost of certain bail bonds, reasonable

expenses incurred by the "insured" at the request of Southern

Guaranty, costs taxed against the "insured" in any suit Southern

Guaranty defends, and interest on any judgment that accrues after

entry of the judgment in a suit against the "insured" that

Southern Guaranty defends.   (BAP 2-3).

        Under the "Liability Coverage" section, the BAP also

lists exclusions to coverage:

        B. Exclusions
        This insurance does not apply to any of the following:
        . . .
        2. Contractual
            Liability assumed under any contract or agreement.
            But this exclusion does not apply to liability for
            damages:
                a. Assumed in a contract or agreement that is an
                "insured contract" provided the "bodily injury" or
                "property damage" occurs subsequent to the
                execution of the contract or agreement; or
                b. That the "insured" would have in the absence of
                the contract or agreement.

(BAP 3).  The BAP defines "insured contract," in pertinent part,

as "That part of any other contract or agreement pertaining to

your business . . . under which you assume the tort liability of

another party to pay for 'bodily injury' or 'property damage' to

a third person or organization."  (BAP 9).

        Southern Guaranty contends that the Service Agreement

14

cannot be an "insured contract" under this definition because the
indemnification clause in the Service Agreement does not include
the independent negligent acts of Go-Mart, and therefore the
Service Agreement does not fulfill Southern Guaranty's
requirement that an insured contract "assume the liability of
another."

Inasmuch as the court has found that the Service
Agreement does contemplate coverage for Go-Mart's independent
negligent acts arising out of or in connection with the operation
of Davenport's trucks on Go-Mart's premises, the Service
Agreement qualifies as an insured contract under the specific
definition set out in the policy, and thus the BAP applies to
Davenport's indemnification of Go-Mart.  The BAP limit of
$1,000,000 was exhausted upon Southern Guaranty's payment of
Davenport's portion of the Meadows judgment, thus the court turns
to the Umbrella Policy.

2. Umbrella Policy

The Umbrella Policy provides coverage in the amount of
a $10,000,000 limit per "occurrence" for "the 'ultimate net loss'
in excess of the 'retained limit' because of 'bodily injury' or

'property damage' to which this insurance applies."  (Umbrella
Policy 1, Declarations).

        Like the BAP, the Umbrella Policy does not apply to
contractual liability unless Davenport would have had liability
in the absence of a contract, or, as here, Davenport assumed
liability in an "insured contract."  (Umbrella Policy 2).  The
Umbrella Policy uses the same definition of "insured contract" as
the BAP.  (Umbrella Policy 13).

        The Umbrella Policy has a Supplementary Payments
section in which Southern Guaranty states that "[i]f we <u>defend</u> an
insured against a 'suit' and an indemnitee of the insured is also
named as a party to the 'suit,'" then the indemnitee is required
to notify other insurers whose coverage is available to the
indemnitee.  (Umbrella Policy 7) (emphasis added).  This notice
requirement only appears under the Supplementary Payments section
as a condition precedent to Southern Guaranty's defense of an
indemnitee, and does not limit the coverage of insured contracts
under the Coverage section.  Further, inasmuch as Southern
Guaranty has already defended Go-Mart in the <u>Meadows</u> action, this
provision is inapplicable to the current coverage dispute.

        Southern Guaranty seeks to avoid liability under the

Umbrella Policy by relying upon the "Contractual Liability"
exclusion.  However, just as the Service Agreement is an "insured
contract" under the BAP, which applies to Davenport's
indemnification of Go-Mart, so too is the Service Agreement an
"insured contract" under the Umbrella Policy, and therefore not
subject to the "Contractual Liability" exclusion.

Southern Guaranty next asserts that the Umbrella Policy
does not apply because Go-Mart has not exhausted its own
available insurance.  (Southern Guaranty Mem. Supp. Mot. Summ. J.
25).  Southern Guaranty bases this argument on the "Other
Insurance" provision in the Umbrella Policy that denies payment
contribution when any other insurer has a duty to defend the
insured.  (Umbrella Policy 11).  In Southern Guaranty's insurance
policies at issue, Davenport is the insured, not Go-Mart.
Indeed, Southern Guaranty acknowledges that "Go-Mart is not an
additional insured."  (Southern Guaranty Mem. Supp. Mot. Summ. J.
3).  It follows then, that this provision applies to Davenport's
other insurance, not that of Go-Mart.

Lastly, Southern Guaranty contends that the Umbrella
Policy does not apply because Davenport and Go-Mart have not
complied with its policy conditions.  (Southern Guaranty Mem.
Supp. Mot. Summ. J. 26).  The Umbrella Policy states that

17

Davenport cannot sue Southern Guaranty unless Davenport has fully complied with its terms.  (Umbrella Policy 11; Southern Guaranty Mem. Supp. Mot. Summ. J. 26-27).  Southern Guaranty claims two violations of its policies on behalf of Davenport and Go-Mart.

First, Southern Guaranty claims Davenport violated the term listed under the section "Duties In The Event Of Occurrence, Offense, Claim or Suit" that states "[In the event of an occurrence, offense, or suit] [n]o insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."  (Southern Guaranty Mem. Supp. Mot. Summ. J. 27, Umbrella Policy 10).  Southern Guaranty accuses Davenport of violating this term by assuming responsibility for Go-Mart's portion of the Meadows verdict and its attorney fees.  Southern Guaranty Mem. Supp. Mot. Summ. J. 27).

This provision is plainly inapplicable inasmuch as Davenport assumed Go-Mart's liability with the indemnification clause of the Service Agreement, which is an "insured contract," before the occurrence and the suit at issue.  The Service Agreement does not conflict with this provision that applies only to agreements made once an incident has arisen.

18

Southern Guaranty also contends that Go-Mart violated its policy under the Supplementary Payments section of the Umbrella Policy because Go-Mart, as an indemnitee of Davenport, failed to "Notify any other insurer whose coverage is available to the indemnitee," as it was required to do.  (Umbrella Policy 7).  This provision relates only to the defense of parties to insured contracts as supplementary payments.  As Southern Guaranty already defended Go-Mart while it was defending Davenport, and inasmuch as the controversy now focuses on the judgment against Go-Mart, this provision is inapplicable. The coverage of Go-Mart's portion of the judgment in the <u>Meadows</u> case relates only to Southern Guaranty's coverage of "insured contracts" in "Section I -- Coverages."  (Umbrella Policy 2).

Go-Mart's failure to notify Arch does not release Southern Guaranty from its obligation to cover Davenport's indemnification of Go-Mart pursuant to the Service Agreement, an insured contract.  Therefore, under the Umbrella Policy, Southern Guaranty has an obligation to cover Davenport's indemnification of Go-Mart in the underlying <u>Meadows</u> action.

C. Arch Is Not Obligated to Provide Coverage to Go-Mart

19

On November 15, 2004, Arch issued a policy with Go-Mart as the insured which remained in effect at the time of the Meadows accident.  The policy limit was $2,000,000, per occurrence, subject to a $25,000 self-insured policy retention by Go-Mart.  (Insurance Agreement 2; Arch Mem. Supp. Mot. Summ. J. 8).  The policy reflects Go-Mart's selection of GAB as its third party claims administrator to handle its claims.  (Arch Compl. Ex. 4 at 3).

Section VI of the Arch policy requires Go-Mart to notify Arch "as soon as practicable" of any occurrence that may result in a claim under the policy.  (Insurance Agreement 13-14). The section goes on to list the requirements of such notification such as sending Arch copies of all demands and notices, authorizing Arch to obtain records and information from any insureds or third parties, and assisting Arch when it exercises its right to defend Go-Mart.  (Insurance Agreement 13-14). Section VI also states that compliance with these duties is a condition precedent to coverage.  (Insurance Agreement 13-14).

Arch initiated this suit on April 30, 2008, requesting a declaration that there was no coverage obligation under the insurance policy respecting the defense or judgment in the

20

underlying <u>Meadows</u> action.  (Arch Compl. 9).  Arch asserts that
the delay of 32 months in notifying it of the <u>Meadows</u> accident
and the failure to notify it of the subsequent lawsuit until
after judgment was unreasonable, prejudicial and strictly in
violation of policy terms.  (Arch Mot. Summ. J. 2-3).  In its
complaint, Arch specifically states that it was prejudiced in
that it was denied its rights to the following:

(a) to conduct or assume control of an investigation;
(b) to marshall evidence;
(c) to formulate defenses;
(d) to undertake or assume control of the defense of Go-Mart
or to associate with Go-Mart in the defense;
(e) to engage counsel for Go-Mart or for itself;
(f) to select and prepare witnesses;
(g) to formulate trial strategy;
(h) to participate in settlement negotiations;
(i) to limit or contain or to attempt to limit or contain
its potential exposure through pre-trial settlement;
(j) to set and to adjust reserves based upon information as
it was developed;
(k) to notify its reinsurer(s);
(l) to assess its liability and exposure under the policy
before it was a foregone conclusion;
(m) to make an independent decision whether to accept or
reject the conditions under which [Southern Guaranty]
accepted the tender made by Go-Mart;
(n) to call into question and to litigate, if necessary or
appropriate, the propriety of the [Southern Guaranty]
reservation of rights prior to the trial of the underlying
action;
(o) to assert the liability of Davenport to provide
unqualified defense and indemnity to Go-Mart irrespective of
the reservations of rights asserted by [Southern Guaranty];
(p) to press for settlement within the limits of the
[Southern Guaranty] policy before there was a finding of
independent negligence on the part of Go-Mart, which finding
may now undermine Go-Mart's indemnification claim against
Davenport and/or Go-Mart's status as the beneficiary of an

```
        insured contract;
        (r) to participate fully in the appellate effort
```
(Arch Compl. ¶ 29).

        GAB, being Go-Mart's third party claims administrator
and a third party defendant in this case, responded to Arch's
Motion for Summary Judgment, contending that Arch's Motion is not
ripe in that Go-Mart has not requested Arch to make any payments
on its behalf.  (GAB Resp. Arch Mot. Summ. J. 6).  GAB further
asserts that the court should decline to rule on Arch's motion
until Go-Mart's entitlement to indemnity from Davenport, and
Southern Guaranty's coverage obligation to Go-Mart, have been
resolved.  (GAB Resp. Arch Mot. Summ. J. 7).

        Arch has demonstrated that there exists a substantial,
live controversy between the parties inasmuch as a judgment has
been entered against Go-Mart and Go-Mart is insured by Arch.  28
U.S.C. § 2201(a).  These facts and circumstances "show that there
is a substantial controversy, between parties having adverse
legal interests, of sufficient immediacy and reality to warrant
the issuance of a declaratory judgment."  <u>Maryland Cas. Co. v.
Pacific Coal & Oil Co.</u>, 312 U.S. 270, 273 (1941) (citing <u>Aetna
Life Ins. Co. v. Haworth</u>, 300 U.S. 227, 239-242 (1937)).

        The notice provision in the Arch policy requires Go-

Mart to notify it of any occurrence as soon as practicable.  Such a requirement enables Arch to effectively exercise its right to defend.  GAB and Arch, citing to West Virginia law, acknowledge that a claim against an insurer is not always defeated by a violation of the notice provision.  More specifically, if the explanation for the delay appears reasonable, "the burden shifts to the insurance company to show that the delay in notification prejudiced [its] investigation and defense of the claim." Dairyland Insurance Co. v. Voshel, 189 W. Va. 121, 428 S.E.2d 542, 546 (1993); see also Colonial Ins. Co. v. Barrett, 208 W. Va. 706, 542 S.E.2d 869, 873 (2000).

Generally, the reasonableness of the delay is a question of fact.  See Medical Assurance of West Virginia, Inc. v. U.S., 233 Fed.Appx. 235, 237 (4th Cir. 2007) (citing Colonial Ins. Co. v. Barrett, 208 W.Va. 706, 542 S.E.2d 869, 875 (W. Va. 2000).  However, the court may find as a matter of law that a jury could not reasonably conclude that there is a valid reason for the delay.  Medical Assurance of West Virginia, Inc., 233 Fed.Appx. at 237.  When the delay is determined to be unreasonable, prejudice need not be determined.  Id. (holding that where the insured had a clear duty to notify the insurer of a potential claim "as soon as practicable" and the insurer did

23

not receive notice until four years after proceedings began, the insured's claimed belief that the scope of coverage did not include the underlying action was unreasonable); <u>United Nat. Ins. Co. V. Lee</u>, 51 Fed.Appx. 407, 410-11 (4th Cir. 2002) (concluding that the insured's claim of being unaware of the underlying lawsuit was unreasonable as a matter of law and precluded any argument on prejudice).

GAB undertakes to explain its delay in notifying Arch by justifying its reliance on Southern Guaranty's initial assumption of Go-Mart's defense. (GAB Resp. to Arch Mot. Summ. J. 9). Even though Southern Guaranty assumed Go-Mart's defense while reserving the right to discontinue coverage should it be determined that Go-Mart's negligence was not related to the operation of Davenport's equipment, GAB claims that it was reasonable "to conclude, as it did, that there were no conceivable facts under which coverage for Go-Mart's liability would be denied." (GAB Resp. to Arch Mot. Summ. J. 9).

It is exceedingly difficult to believe that Go-Mart and GAB did not appreciate both the prospect of liability being imposed upon Go-Mart and the potential denial of coverage by Southern Guaranty of Davenport's indemnification of Go-Mart, in which event Go-Mart would at the least be put to great expense to

24

protect itself in this very litigation.  Virtually all concern and responsibility on Go-Mart's part could have been avoided simply by giving Arch timely notice.  Instead, Arch was given no notice for nearly three years during which the verdict against Go-Mart became a <u>fait</u> <u>accompli</u>.  It was inexcusable and entirely unreasonable as a matter of law that GAB, as the agent of Go-Mart, failed to notify Arch immediately of the Meadows claim.

Moreover, prejudice to Arch has in any event been established.  In <u>Dairyland</u>, the West Virginia Supreme Court of Appeals held that the insurer was prejudiced by a nearly two-year delay in notification of a claim because by the time the insurer was able to investigate the claim, a previous owner of the vehicle at issue could not be found, making the chain of title, and thus coverage of the vehicle, difficult to establish. <u>Dairyland Ins. Co.</u>, 189 W. Va. at 125.  Here, Arch was prejudiced by the 32 month delay in notification inasmuch as it was denied any right to compromise, defend or even assist in the claims against Go-Mart prior to jury verdict and judgment in the <u>Meadows</u> case.

More particularly, Arch has shown that it was grievously prejudiced inasmuch as the delay in notification resulted in its list of seventeen detailed deprivations of Arch's

25

rights with respect to Go-Mart's involvement in the <u>Meadows</u> claim.  These deprivations go far beyond posing difficulty and mere inconvenience to Arch in the handling of the claim against Go-Mart.  Rather, they rise to the level of rendering Arch impotent in the face of a more than $1 million tab it may have been able to prevent or substantially reduce had it been able to manage the defense of Go-Mart wholly apart from Southern Guaranty which was also handling the defense of Davenport.  Accordingly, Arch has no duty under its insurance policies to cover Go-Mart's portion of the <u>Meadows</u> verdict.


D. GAB Breached Its Contract With Go-Mart by Failing to Timely Notify Arch of the <u>Meadows</u> Accident and Claim

Go-Mart and GAB entered into a written agreement, "Contract for Services," effective from November 30, 2004, to November 29, 2005, wherein, as noted, Go-Mart employed GAB as its third party administrator.  (Go-Mart Mem. Supp. Mot. Summ. Jgt GAB 2).  Under the contract, GAB agreed to accept, review and investigate all general liability claims against Go-Mart.  Go-Mart in turn agreed to "relinquish full and complete authority and control to GAB Robins for all matters pertaining to the handling of claims within GAB Robins' discretionary settlement authority limit under this contract." (Contract for Services 1-2,

Schedule A).[4]  The Contract for Services further provided that all notices of claims against Go-Mart shall be forwarded exclusively to GAB, implying that GAB had the sole responsibility for contacting Go-Mart's insurance carriers in the event of a claim.  (Contract for Services 3).

        After Arch instituted this action, Go-Mart filed a third party complaint against GAB for breach of contract.  Go-Mart has moved for summary judgment against GAB, asserting GAB breached its contract with Go-Mart by failing to timely notify Arch of the Meadows accident, claim and action.  GAB responded that Go-Mart's damages from the alleged breach of contract are speculative because it is yet unknown whether Davenport will indemnify Go-Mart for the Meadows verdict and related costs, and whether Southern Guaranty will cover Davenport for the judgment and expenses.  Go-Mart alleges that as a result of GAB's breach of contract, it has suffered, and continues to suffer, actual damages.  Inasmuch as Go-Mart is a Meadows judgment debtor and has been forced to litigate defense and coverage obligations that may not have been required of it had Arch assumed Go-Mart's defense, Go-Mart's damages are not merely speculative.  Go-Mart

_____

    [4] It does not appear to be contested that Meadows's claim was within GAB's discretionary settlement authority limit.

27

notified GAB of Meadows's accident on July 22, 2005, and, as
already noted, it was GAB's responsibility to notify Arch of the
Meadows accident, claim and the underlying action.  GAB's
untimely notification, delayed for 32 months, was a breach of
contract and a failure to fulfill its obligation as set forth in
the contract for services between Go-Mart and GAB.


E.  Attorney Fees, Costs and Expenses


          Various parties have requested attorney fees, costs and
expenses should they prevail in Phase I of this action.


          1.  Arch's Claims for Attorney Fees and Costs Against
                        Go-Mart and Davenport

          Arch includes in its prayer for judgment a demand that
the court declare that Arch "is entitled to recover its attorney
fees and court costs, as allowed by law." (Arch. Compl. 9).  The
"American Rule" is the general rule in litigation that each party
bears its own attorney fees.  <u>Fogerty v. Fantasy, Inc.</u>, 510 U.S.
517, 533 (1994).  Inasmuch as Arch has not identified a
contractual or statutory provision upon which to base a fee
shifting award that would depart from the American Rule that each
party must bear its own attorney fees, that request is denied.

                              28

### 2. Go-Mart's Claims for Attorney Fees, Costs and Expenses Against GAB

In moving for summary judgment against GAB, Go-Mart requests that on account of GAB's breach of contract the court find that GAB has a duty to indemnify it for attorney fees, costs and expenses in addition to damages.

The indemnification provision of the Contract for Services states that GAB shall indemnify Go-Mart "with respect to any claims or demands, actions, damages, costs and expenses resulting from any errors, omissions, torts or other negligent act or omissions" of GAB.  (Contract for Services 4-5).  The Contract for Services provides that it shall be interpreted and construed according to New York law.  (Contract for Services 5).

It is settled New York law that "the court should not infer a party's intention to waive the benefit of the [American Rule] unless the intention to do so is <u>unmistakenly clear</u> from the language of the promise."  <u>U.S. Fidelity and Guar. Co. v. Braspetro Oil Services Co.</u>, 369 F.3d 34, 75 (2d Cir. 2004) (quoting <u>Hooper Assocs., Ltd. v. AGS Computers, Inc.</u>, 548 N.E.2d 903, 905 (N.Y. 1989) (emphasis in original).

29

Here, GAB agreed to indemnify Go-Mart from any claims or demands, actions, damages, costs and expenses resulting from GAB's errors.  This language encompasses any loss ultimately sustained by Go-Mart by virtue of its loss of coverage under the Arch policy as well as Go-Mart's expenses in prosecuting its indemnification claim and defending itself herein against Arch and others, including attorney fees, costs and expenses.  All such loss will have been incurred as a direct result of GAB's failure to timely notify Arch of the Meadows accident and subsequent lawsuit.  See Muli v. Schambra, 6 A.D.3d 676, 677-78, 775 N.Y.S.2d 177, 178-79 (N.Y. 2004).[5]

3. Go-Mart's Recovery of Attorney Fees from Davenport

Go-Mart is entitled to recover from Davenport any attorney fees, costs and expenses it may have incurred in the Meadows case, inasmuch as the Service Agreement indemnification clause provides for the recovery of reasonable attorney fees, costs and expenses.

---

[5] In the event Davenport is not found liable for Go-Mart's attorney fees in this action, GAB would be responsible therefor. See infra at 28.

As to whether Go-Mart may recover from Davenport the
attorney fees, costs and expenses incurred by it in the present
action, there is a latent ambiguity in the Service Agreement
indemnity clause, in that it is not entirely clear that
litigation designed to enforce the clause was contemplated by its
terms.  One might reasonably conclude either way.  In view of the
ambiguity, neither party is entitled to summary judgment at this
juncture.  It is also to be observed that the issue may become
moot if Go-Mart realizes a recovery of those same items from GAB.

## 4. Davenport's Recovery of Attorney Fees, Costs and Expenses and Other Damages from Southern Guaranty in Phase I

Aside from the damages related to bad faith and unfair
trade practices to be determined in Phase II of this action,
Davenport is seeking in Phase I compensatory damages outside the
coverage limits of the Southern Guaranty policies as well as
punitive damages.  Davenport claims it is entitled to attorney
fees, costs and expenses, punitive damages and consequential
damages in Phase I of this action including compensation for "net
economic loss and annoyance and inconvenience resulting from
Southern Guaranty's breach of contract."  (Davenport Mem.
Regarding Damages 3).

The West Virginia Supreme Court of Appeals has held

31

that "When a policyholder substantially prevails in a first-party lawsuit against her insurance company to enforce an insurance contract, the policyholder may recover, among other consequential damages, her reasonable attorney fees and costs." Richardson v. Kentucky Nat. Ins. Co., 216 W.Va. 464, 607 S.E.2d 793, 799 (W. Va. 2004) (citing Hayseeds, Inc. v. State Farm Fire & Cas., 177 W.Va. 323, 352 S.E.2d 73, syl. pt. 1 (W. Va. 1986)).

However, West Virginia law does not necessarily apply to each type of damages sought.  Inasmuch as this action is in federal court under diversity jurisdiction, West Virginia's choice of law rules apply.  See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487 (1941).  Where Davenport is seeking damages under contract and tort theories, the source of the law to be applied to each must be determined.

a. Punitive Damages

West Virginia classifies punitive damages in a breach of contract claim as a tort requiring "actual malice."  Hayseeds, Inc. v. State Farm Fire & Cas., 177 W.Va. 323, 352 S.E.2d 73, 80 (W. Va. 1986); McCormick v. Allstate Ins. Co., 202 W.Va. 535, 505 S.E.2d 454, 463 (W. Va. 1998).

In tort actions, West Virginia relies on <u>lex loci</u> <u>delicti</u>, or the law of the place where the wrong occurred.  <u>Paul</u> <u>v. National Life</u>, 177 W.Va. 427, 352 S.E.2d 550, 556 (W. Va. 1986).  The West Virginia Supreme Court of Appeals has further relied on the Restatement (Second) of Conflict Laws (1971), Sections 6 and 145, in cases such as this wherein damages are claimed for a tort underlying a breach of contract claim.  <u>M & S</u> <u>Partners v. Scottsdale Ins. Co.</u>, 277 Fed.Appx. 286, 289 (4th Cir. 2008) ("When reviewing complex contracts and 'parasitic' torts -- i.e., torts dependent upon an underlying breach of contract claim, West Virginia Courts have resorted to using the Restatement.") (citations omitted).  In determining the proper forum, the court looks to the Section 6 factors:

> (a) the needs of the interstate and international systems;
> (b) the relevant policies of the forum;
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
> (d) the protection of justified expectations;
> (e) the basic policies underlying the particular field of law;
> (f) certainty, predictability, and uniformity of result; and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971); <u>M & S</u> <u>Partners</u>, 277 Fed.Appx. at 289.

The court additionally looks at the following contacts

33

from Section 145 of the Restatement, designed to help illuminate

the section 6 factors:

> • the place where the injury occurred;
> • the place where the conduct causing the injury
> occurred;
> • the domicile, residence, nationality, place of
> incorporation, and place of business of the parties;
> and
> • the place where the relationship, if any, between the
> parties is conferred.

Restatement (Second) of Conflict of Laws § 145 (1971); <u>M & S</u>

<u>Partners</u>, 277 Fed.Appx. at 289.


1. Section 145 Contacts

Applying first the Section 145 contacts, the injury

occurred in this state when Southern Guaranty failed to honor

Davenport's indemnification of Go-Mart.  The conduct causing that

injury presumably occurred in Alabama, Southern Guaranty's

alleged principal place of business.[6]  The effects of that

_____

[6] In Go-Mart's amended third party complaint against
Southern Guaranty, paragraph two states, "Upon information and
belief, Southern Guaranty is a Wisconsin corporation with its
principal place of business in Montgomery, Alabama."  (Go-Mart
Third Party Compl. ¶ 2).  In its answer, Southern Guaranty
responds, "In response to Paragraph 2 of the Amended Third Party
Complaint, Third Party Defendant Southern Guaranty states that it
is an insurance company authorized to do business in the State of
West Virginia."  (Southern Guaranty Ans. ¶ 2).  However, inasmuch
as Southern Guaranty had a regional office in Greensboro, North
Carolina, the address of which is listed on its policies with
Davenport, Southern Guaranty may have been operating out of its

34

failure, as Davenport claims them, are financial in nature and
are thus felt in Davenport's principal place of business.
Davenport is a North Carolina corporation with its principal
place of business in North Carolina.   (Go-Mart Cross-clm. ¶ 3).
Furthermore, the policies issued by Southern Guaranty to
Davenport were contracted for and delivered in North Carolina.
(Southern Guaranty Resp. to Davenport's Mem. Regarding Damages
3).   These contacts weigh in favor of North Carolina law.


2. Section 6 Factors

        As for the Section 6 factors, there is no indication
that the use of North Carolina law in regards to punitive damages
would cause any friction between North Carolina and West
Virginia, as both states recognize the right to punitive damages
in certain breach of contract claims.  While W.Va. Code § 33-11-1
sets forth West Virginia's interest in regulating insurance
industry trade practices, North Carolina has perhaps a greater
interest here in regulating coverage obligations between an
insurance agency and a company where a North Carolina company and
a North Carolina based insurance policy are involved.  It thus

---

North Carolina office when it declined to continue its coverage
of Go-Mart.

serves the purpose of predictability and uniformity of result if North Carolina law is consistently applied between Davenport and Southern Guaranty in determining tort liability.

The remaining Section 6 factors left undiscussed appear to be neutral on the issue of North Carolina versus West Virginia law, but the combination of Section 145 and Section 6 considerations weigh strongly in favor of applying North Carolina law.  While Go-Mart has a focal role in this conflict, the issue at this juncture centers upon Davenport's contract with Southern Guaranty and Southern Guaranty's breach, which is sufficiently grounded in North Carolina contacts and interests to apply North Carolina law to the question of punitive damages.


3. Application of North Carolina Law

Under North Carolina law, a party may bring an action for tortious breach of contract to collect punitive damages provided an identifiable tort is alleged and the tort is accompanied by aggravation, along with the breach.  Cash v. State Farm Mut. Auto. Ins. Co., 137 N.C.App. 192, 200, 528 S.E.2d 372, 377 (N.C. Ct. App. 2000).  Relevant North Carolina cases cite to Holmes v. Carolina Cent. R. Co., 94 N.C. 318 (N.C. 1886), which states that "[p]unitive damages are never awarded, except in

36

cases 'when there is an element either of fraud, malice, such a
degree of negligence as indicates a reckless indifference to
consequences, oppression, insult, rudeness, caprice, willfulness,
or other causes of aggravation in the act or omission causing the
injury.'"  Holmes at *4 (citing Thompson on Carriers of
Passengers, 575; Southerland on Damages, vol. 3, p. 270).

        North Carolina courts have used the Holmes language to
describe the level of required aggravation to warrant punitive
damages in breach of contract cases.  See Cash, 137 N.C.App. at
201; Taha v. Thompson, 120 N.C.App. 697, 705, 463 S.E.2d 553, 558
(N.C. Ct. App. 1995); Miller v. Nationwide Mut. Ins. Co., 112
N.C.App. 295, 305, 435 S.E.2d 537, 544 (N.C. Ct. App. 1993); von
Hagel v. Blue Cross and Blue Shield of North Carolina, 91
N.C.App. 58, 61, 370 S.E.2d 695, 698 (N.C. Ct. App. 1988).  While
the question of whether the alleged facts give rise to the
required level of aggravation is one for the trier of fact,
"[t]he facts and allegations in the complaint must be sufficient
to prevent confusion and surprise to the defendant and to
preclude recovery of punitive damages for breach of contract
where tortious conduct does not accompany the breach."  Miller,
112 N.C.App. at 544.

        In its "cross-claim" against Southern Guaranty,

                                37

Davenport has alleged under its "Bad Faith" count that Southern
Guaranty acted in "willful, wanton, malicious and/or conscious
disregard and/or criminal indifference."  The North Carolina
Court of Appeals has held "in the past that where plaintiff's
allegations that a defendant has acted in bad faith accompanied
by willful and malicious conduct are supported by specific
examples, plaintiff has sufficiently alleged a tortious act
accompanied by the requisite element of 'aggravation.'"  Miller,
112 N.C.App. at 544.  Inasmuch as Davenport's claims for punitive
damages appear to relate to its bad faith claims, and the
punitive damage awards under North Carolina similarly invoke bad
faith, the issue of punitive damages for Southern Guaranty's
breach of contract is necessarily entwined with bad faith.
Indeed, it appears that to prevail on the issue of punitive
damages, Davenport would have to prove the elements of its bad
faith claim, which makes this issue one more appropriately
relegated to Phase II of this action.

b. Attorney Fees, Costs and Expenses and Consequential Damages

          When determining rights and duties under a contract,
such as the contractual duty to pay attorney fees, costs and
expenses, West Virginia applies the rule of lex loci contractus,

or "the law of the state where a contract is made and is to be performed." <u>Gabler v. Nationwide Ins. Cos.</u>, 866 F.2d 1415, 1 (4th Cir. 1989) (per curiam). Inasmuch as the Southern Guaranty insurance policies were "contracted for and delivered" in North Carolina and the proceeds of the insurance policies are to be paid in North Carolina, the court applies North Carolina law to the issue of attorney fees owed to Davenport in this action.

The North Carolina Court of Appeals has held that the general rule for awarding attorney fees in insurance coverage actions is that "the victorious party's attorney fees are not recoverable except in instances (1) where the breached insurance contract was one for legal services or, in other words, a contract creating a duty to defend, (2) where the insurer acted in bad faith in denying coverage, or (3) where otherwise authorized by contract or statute." <u>Collins & Aikman Products Co. V. Hartford Acc. & Indem. Co.</u>, 125 N.C.App. 412, 414, 481 S.E.2d 96, 97 (N.C. Ct. App. 1997) (citing <u>Jamestown Mut. Inc. Co. v. Nationwide Mut. Ins. Co.</u>, 277 N.C. 216, 218, 176 S.E.2d 751, 754 (N.C. 1970); <u>Perkins v. American Mut. Fire Ins. Co.</u>, 4 N.C.App. 466, 467-68, 167 S.E.2d 93, 94-95 (N.C. Ct. App. 1969)).

Southern Guaranty upheld its duty to defend, but breached its duty to indemnify for an insured contract. Inasmuch

39

as the second prong of the general rule is the only one that applies to Southern Guaranty's breach, the issue of Davenport's attorney fees will be more appropriately resolved in Phase II of this action, should Davenport prevail on its bad faith claim.

The North Carolina Court of Appeals has not ruled on the issue of whether an insured may be awarded consequential damages for an insurer's breach of contract.  See Blis Day Spa, LLC v. Hartford Ins. Group, 427 F.Supp.2d 621, 637 (W.D. N.C. 2006).  In examining this issue, the Western District of North Carolina predicted that the North Carolina Court of Appeals would allow consequential damages to the extent that they would be "reasonably presumed to have been within the contemplation of the parties at the time they made the contract, as the probable result of the breach of it."  Id. at 638 (quoting Johnson v. Railroad Co., 140 N.C. 574, 577, 53 S.E. 362, 363 (N.C. 1906).

Whether or not consequential damages were within the contemplation of the parties, or foreseeable, depends on "the information communicated to or the knowledge of the parties at the time and the reasonable foreseeability of such damages." Blis Day Spa, 427 F.Supp.2d at 638.  In Blis Day Spa, the court held that consequential damages were not recoverable where the plaintiffs failed to produce evidence, be it from the contract or

40

elsewhere, that the parties contemplated coverage for consequential damages at the time of contracting.  Id. at 639. The contemplation of Southern Guaranty and Davenport, as to consequential damages, at the time of contracting is unclear. Inasmuch as the insurance policies and other evidence are ambiguous as to the contemplation of Davenport and Southern Guaranty of consequential damages, the issue is not one appropriately subject to determination at the summary judgment stage.

### V. Conclusion

Accordingly, it is ORDERED as follows:

1. That Southern Guaranty's Motion for Summary Judgment be, and it hereby is, denied;

2. That Davenport's Motion for Summary Judgment as to its claim for Southern Guaranty's duty to cover Davenport's indemnification of Go-Mart under the BAP and the Umbrella Policy be, and it hereby is, granted, and is denied in all other respects;

3. That Go-Mart's Motion for Summary Judgment as to its

claims against Davenport to enforce the indemnification provision in the Service Agreement be, and it hereby is, granted, and is denied in all other respects;

4. That Go-Mart's Motion for Summary Judgment as to its claims against Southern Guaranty be, and it hereby is, denied;

5. That Arch's Motion for Summary Judgment as to its claims against Go-Mart, Davenport and Rader be, and it hereby is, denied with respect to its request for its attorney fees, and granted in all other respects;

6. That Go-Mart's Motion for Summary Judgment as to its claims against GAB be, and it hereby is, provisionally granted while awaiting a determination of the extent to which Go-Mart is made whole by Davenport.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.

DATED: December 28, 2009

John T. Copenhaver, Jr.
United States District Judge

42